**UNITED STATES, Appellee,**

v.

**William N. STINSON, Staff Sergeant
U.S. Air Force, Appellant.**

No. 66,484.
ACM 28863.

U.S. Court of Military Appeals.

Argued April 21, 1992.
Decided May 21, 1992.

**234**

For Appellant: *Captain Richard W. Aldrich* (argued); *Colonel Jeffrey R. Owens* and *Major Mary C. Yastishock* (on brief); *Major Ronald G. Morgan* and *Major Alice M. Kottmyer.*

For Appellee: *Major Jeffrey C. Lindquist* (argued); *Major Ann M. Mittermeyer* and *Major Paul H. Blackwell, Jr.* (on brief); *Lieutenant Colonel Brenda J. Hollis.*

*Opinion of the Court*

GIERKE, Judge:

Appellant was charged with three specifications of rape and three specifications of committing indecent acts with a female under 16 years of age, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. The victim of all offenses was appellant's 9–year–old daughter. Before a military judge sitting as a general court-martial, he pleaded not guilty to the rape specifications but guilty to the lesser-included offenses of carnal knowledge, and guilty to committing the indecent acts. The military judge found him guilty as charged and sentenced him to a dishonorable discharge, confinement for 18 years, and reduction to airman basic. The convening authority approved the sentence, and the Court of Military Review affirmed the findings and sentence in an unpublished opinion dated February 7, 1991.

We granted review * of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY PERMITTING A GOVERNMENT EXPERT WITNESS TO TESTIFY BEYOND HER AREA OF EXPERTISE.

II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY PERMITTING TRIAL COUNSEL TO INTRODUCE IMPROPER REBUTTAL, THROUGH THE TESTIMONY OF MS. MCINTYRE, TO APPELLANT'S UNSWORN STATEMENT.

In addition, we treated appellant's request to file a supplemental brief as raising a third issue and granted review of the following issue:

WHETHER APPELLANT'S COURT–MARTIAL WAS REFERRED BY THE

---

* We heard oral argument in this case at the United States Air Force Academy at Colorado Springs, Colorado, on April 21, 1992, at the invitation of the Department of Law, United States Air Force Academy, and without objection from the parties involved. *See* Foundation of the Federal Bar Association, *Equal Justice Under Law: The Supreme Court in American Life* 15–18 (1965); *see also* D. O'Brien, *Storm Center: The Supreme Court in American Politics* 78, 135–40 (2d ed. 1990). This procedure is similar to the well-established practice of the United States Court of Appeals for the Eighth Circuit which holds hearings at various law schools within its circuit.

The United States Court of Military Appeals conducts a hearing such as this outside its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court but also the quality and effectiveness of the criminal justice system of our Armed Services, the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). It is hoped that the thousands of students, service persons, military and civilian attorneys, and members of the American public who witness these hearings will realize that America is a democracy that can maintain an Armed Force instilled with the appropriate discipline to make it a world power and yet afford the members of that Armed Force a fair and impartial justice system which does provide the full protection of the Constitution of the United States and Federal law to its members.

CONVENING AUTHORITY AS A CAPITAL CASE, TRIED BY A MILITARY JUDGE ALONE AS A NONCAPITAL CASE, AND THEREFORE LACKED JURISDICTION TO TRY APPELLANT.

We hold that the court-martial had jurisdiction to try appellant; the military judge did not abuse his discretion by permitting Ms. McIntyre to testify; and appellant was not prejudiced by the improper rebuttal testimony.

## I. *Facts*

After charges were preferred and investigated in accordance with Article 32, UCMJ, 10 USC § 832, a civilian attorney-advisor prepared the staff judge advocate's pretrial advice to the general court-martial convening authority. The pretrial advice lists the maximum punishment for each rape specification as "Death—OR—DD, Conf x Life, TF, Red to E–1." The pretrial advice recommends that "the Charges and Specifications be referred to trial by general court-martial as a noncapital case." The staff judge advocate approved and adopted the attorney-advisor's pretrial advice. The convening authority ordered that the Charges and specifications be referred to a "general court-martial as a noncapital case" and personally signed the order. (*See* Appendix.) The staff judge advocate then indorsed the charge sheet "For the Commander," directing trial by general court-martial but stating under "instructions: None," thereby omitting the convening authority's explicit direction that the case be tried as noncapital.

When the court-martial convened, the parties treated the case as noncapital. The military judge granted appellant's request for a bench trial, permissible only if the case was tried as noncapital. Art. 18, UCMJ, 10 USC § 818; RCM 201(f)(1)(C), Manual for Courts–Martial, United States, 1984. After convicting appellant, the military judge announced that the maximum imposable sentence was a dishonorable discharge, life imprisonment, total forfeitures, and reduction to the lowest enlisted grade; both sides concurred.

After findings were announced, the prosecution presented the testimony of Ms. Mary K. McIntyre, a family advocacy therapist at Randolph Air Force Base, San Antonio, Texas. Ms. McIntyre had been present in the courtroom throughout the trial, observing appellant's responses during the plea inquiry and the victim's testimony. Prior to testifying she interviewed the victim and reviewed the Office of Special Investigations (OSI) report, appellant's confession, the victim's pretrial statement, and mental health records from the Family Advocacy Program. The contents of the OSI report and the mental health records were not described in detail during the trial. Ms. McIntyre had no contact with appellant prior to trial.

Ms. McIntyre testified that she received a bachelor's degree in psychology and sociology in 1970 and a master's degree in social work in 1983. After obtaining her master's degree, she worked as a social worker with the State of Texas "in investigations of child sexual abuse and physical abuse and, for the most part, ... with the military in their family advocacy program." She testified that she worked "more often with victims, ... but I do a lot of work with perpetrators as well." She had "testified ... as an expert witness ... [s]ix or seven times ... as an expert in the field of social work with a specialty in child sexual abuse from both the victim and the offender perspectives." Trial counsel offered Ms. McIntyre "as an expert in the field of social work with a subspecialty of child sexual abuse from the victim and offender," having "subspecialties within the broad spectrum of child sexual abuse." Trial defense counsel did not cross-examine Ms. McIntyre about her credentials but immediately announced, "Well, Your Honor, based on my reading of the law as explained in *U.S. v. Mustafa*, [22 MJ 165 (CMA), *cert. denied*, 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986) ] we would tend to agree that she's certainly qualified." Later in the trial, in response to questioning by the military judge, Ms. McIntyre testified that she had worked with "close to 500" "female child victims."

After eliciting testimony about the probable effects of the offenses on the victim, trial counsel questioned Ms. McIntyre as follows:

Q. Now let's move into the offender's side of this. What kind of things do you look for when you're evaluating an offender?

A. What I would want to know is a complete sexual history, you know, background history about child sexual abuse in his childhood, which may or may not make too much difference; the number of times the incident has occurred; when the incident started; what kind of abuse—for example, was it at fifteen, was he twenty-two, what kind of things he did to prepare himself to have sex with a child.

Q. And you're familiar with the facts that are present in this case as far as what happened. What facts in this particular case cause you concern?

A. My concern is that there didn't seem to be any setting up of the sexual abuse. It appears to be a very impulsive, selfish act. He wanted to have sex with this child and without any kind of preparation of the child herself in terms of seducing her over a period of time.

Q. By "seducing over a period of time," what do you mean by that?

A. Starting off with perhaps fondling, showing himself to her—that kind of thing; preparing her over a period of time to be more accepting of intercourse.

Q. Any other thing, any other specific facts in this case that cause you concern that you can recall?

A. The fact that the child told him to stop and appeared to be feeling hurt—you know, told him it hurt, and he disregarded that totally.

DC: (Capt Willner) Your Honor, I'm going to object again at this point. It's up to this court to determine a punishment based on the court's feelings for what you see as the aggravating factors, and quite honestly, at this point, with all due respect to any particular witness, again it's up to Your Honor to decide what

facts concern you the most. So I'm going to ask that this line of questioning be disregarded and we move on to something else.

MJ: Captain Willner, I'll take that all under consideration when I deliberate on an appropriate sentence in this particular case. I know your concerns in this area.

\* \* \* \* \* \*

TC: Now, you haven't had any chance to evaluate Sergeant Stinson.

WIT: No, I haven't.

Q. But you are familiar with what he's done.

A. Yes.

When trial counsel asked Ms. McIntyre for a prognosis regarding appellant, the defense objected on the ground that the answer would be pure speculation, since she had not interviewed appellant. The military judge acknowledged that "[s]he has not talked with him, she knows nothing about the background of Sergeant Stinson, whether he's been a victim of child abuse in the past, and so forth and so on." Nevertheless, he overruled the defense objection. Trial counsel then questioned Ms. McIntyre further as follows:

TC: Based upon what you know in this case and applying it to what you know generally about these types of offenses and the indicators that you talked about, what kind of prognosis do you see, in your professional opinion, for someone such as Sergeant Stinson?

WIT: I would say a fairly poor prognosis.

Q. And what kind of risk do you think of reoffense there is?

A. A high risk of reoffense.

On cross-examination Ms. McIntyre testified as follows:

Q. Now when you ventured your guess as to what a prognosis might be with regard to Sergeant Stinson, you said before that you hadn't had a chance to talk with him.

A. That's correct, I have not.

Q. And when you spoke with me about this case before, you told us that if you

had the opportunity to have more information, such as talking with him, you'd probably be able to give a more accurate assessment, correct?

A. That's correct, I would. Yes.

Q. Because anybody would have to say that without having that kind of information, their guess is quite limited, right?

A. Correct.

Further cross-examination established that the victim had recanted her complaint and that appellant had readily admitted the offenses when questioned. Finally, the military judge questioned Ms. McIntyre as follows:

Q. Ms. McIntyre, for my own edification, I would like to have you expand a bit on your testimony regarding a sexual abuse case where you have a setup of the individual. Somebody used the term "a grooming" of the potential victim, as opposed to an opportunity of chance.

A. Normally, a perpetrator will begin an offense seducing the child to make it more palatable to her so that it's not just a forceful kind of taking what he wants. Many times they will want the child to even experience pleasure, because they feel like they're not doing something so wrong; it's just that they want to enjoy this experience with the kid and have the child also be part of that. When somebody simply takes a child, his own daughter, as an object to chance, or a target of chance, or however this was stated, he is not in any way thinking about the child herself. In other words, it's pretty much masturbation in a child's body who just happens to be there. It's a very selfish kind of behavior.

Q. So are you saying there is a better chance for rehabilitation, if you will, or a better prognosis for the former than the latter, the individual who grooms the victim?

A. I don't know if there's a better chance for rehabilitation, but we can get into the behavior about the—typically there's the thought, the fantasy, the masturbation to the fantasy, then beginning to plan the act, the cognitive distortions to how to get the child alone—she probably really likes it, because in my fantasies she likes it. If you have somebody who just impulsively takes what he wants, it's very difficult to do some behavior modification with that, if you see what I'm—Does that make sense?

Q. Isn't there another school of thought who would say the former, the individual who goes through the grooming, the setting up, certainly would harbor a greater degree of premeditation and scheming, if you will, than the individual who takes the opportunity of chance?

A. In terms of rehabilitation, however, you can work with the behavior modification with that to have them start looking at what events set that up, what thoughts in his head sets that up. With somebody who simply takes what he wants because it's available, I mean it might as well have been the family pet. I would have some real concerns about, you know, other sexual proclivities.

At the conclusion of the defense case in extenuation and mitigation, appellant made an unsworn statement, during which he said, "I do accept responsibility for what I did, and I would also like you to know that, if given the chance, nothing like this will ever happen again."

The prosecution called Ms. McIntyre in rebuttal and asked her to comment on appellant's statement. She responded, without defense objection, that it caused her "concern" because:

In a treatment with offenders, the main focus is control. We would never ever say you could be cured, that you won't do this again—you know—go, you're released, you'll never do it again. The focus is always, it can always happen again; you always have to watch. And they have to take responsibility for that, that it can happen again.

The defense followed by asking Ms. McIntyre if she would be more comfortable if appellant did not promise to never do it again, and she responded, "It would make me feel more comfortable if he said—I will do everything I can to prevent myself be-

ing in a situation where I would sexually abuse again."

Questioned by trial counsel, she explained that "the focus of therapy with offenders is for them to always know that they can always reabuse and they have to watch it every single minute." Responding to the military judge's question, she agreed that her analysis was an "outgrowth of the Alcoholics Anonymous philosophy."

## II. *Jurisdiction*

■ Appellant contends that his court-martial is void for lack of jurisdiction because the indorsement on the charge sheet does not direct that the case be tried as noncapital. Rape is punishable "by death or such other punishment as a court-martial may direct." Art. 120(a); para. 45e(1), Part IV, Manual, *supra*. *See also* RCM 1004(c)(9)(A). *But see* RCM 1004(b)(1)—this notice was never given. Referral of charges to a court-martial ordinarily is evidenced by an indorsement on the charge sheet. A convening authority may direct trial of a capital offense as noncapital unless the death penalty is mandatory. RCM 601(e)(1), Discussion.

Omission of the convening authority's limiting instruction from the referral indorsement on the charge sheet was an administrative irregularity. An administrative defect in the referral process does not necessarily deprive the court-martial of jurisdiction. *United States v. Gebhart*, 34 MJ 189 (CMA 1992); *United States v. King*, 28 MJ 397 (CMA 1989); *United States v. Jette*, 25 MJ 16 (CMA 1987). In appellant's case the convening authority's directive (*see* Appendix) was clear, and the parties conducted the trial in accordance with that directive. Neither party challenged the military judge's authority to conduct the trial without members. We hold that the administrative error in the indorsement of the charge sheet did not deprive the court-martial of jurisdiction.

## III. *Expert Testimony*

In a sentencing hearing, an accused's potential for rehabilitation is a proper subject of testimony by qualified experts. RCM 1001(b)(5). Appellant contends that the military judge erred by permitting Ms. McIntyre to testify beyond the limits of her expertise. Three issues are raised by his contention: (1) Was Ms. McIntyre qualified to testify as an expert? (2) Was her testimony within the limits of her expertise? and (3) Was her expert opinion based on a sufficient factual basis to make it relevant?

■ Mil.R.Evid. 702, Manual, *supra*, provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Mil.R.Evid. 702 allows "[a]nyone who has substantive knowledge in a field beyond the ken of the average court member" to be qualified as an expert witness. *United States v. Stark*, 30 MJ 328, 330 (CMA 1990). "The witness need not be 'an outstanding practitioner,' but only someone who can help the jury." *United States v. Mustafa*, 22 MJ 165, 168 (CMA), *cert. denied*, 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Ms. McIntyre's formal education and practical experience clearly qualified her as an "expert" within the meaning of Mil.R.Evid. 702. Accordingly, we hold that the military judge did not abuse his discretion by permitting Ms. McIntyre to testify as an expert.

■ Turning to the second issue, we hold that the military judge did not abuse his discretion by permitting Ms. McIntyre to opine about appellant's prognosis for rehabilitation. Her formal education and practical experience with child abusers qualified her to render such an opinion. *See United States v. Stark, supra* (forensic psychologist qualified to testify about impact of child abuse even though his area of expertise was child-witness credibility). When the military judge questioned Ms. McIntyre regarding the basis for her prognosis, her responses clearly demonstrated "substan-

tive knowledge ... beyond the ken of the average court member." *Id.* at 330.

◼ Regarding the third issue, we note that Ms. McIntyre did not interview appellant and knew little about his background. An interview with a person is not a condition precedent to admissibility of testimony about that person. *Barefoot v. Estelle,* 463 U.S. 880, 903–04, 103 S.Ct. 3383, 3399–400, 77 L.Ed.2d 1090 (1983); *United States v. Hammond,* 17 MJ 218 (CMA 1984). Lack of personal contact with the person goes to weight, not admissibility. Commenting on psychiatric predictions of future dangerousness in a capital murder case, the Supreme Court in *Barefoot* observed:

All of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury. Petitioner's entire argument ... is founded on the premise that a jury will not be able to separate the wheat from the chaff. We do not share in this low evaluation of the adversary process.

463 U.S. at 899 n. 7, 103 S.Ct. at 3398 n. 7.

In appellant's case the defense effectively used cross-examination and argument to highlight the shortcomings in Ms. McIntyre's prognosis. The military judge recognized those shortcomings and commented on them. On the other hand, her observation of appellant during the trial and her familiarity with the OSI report and the evidence introduced at the trial provided a sufficient factual basis for her opinion to make it relevant. Of course, even relevant evidence must be weighed against the potential for unfair prejudice or misleading the trier of fact. Mil.R.Evid. 403. In a bench trial, the likelihood of unfair prejudice is greatly reduced. In the absence of evidence to the contrary, we will presume that the military judge properly evaluated Ms. McIntyre's testimony in accordance with Mil.R.Evid. 403 and 702. *United States v. Lewis,* 12 MJ 205, 208 n. 4 (CMA 1982). Thus, there was no error.

## IV. *Rebuttal Evidence*

◼ Appellant contends, and the Government concedes, that appellant's promise not to repeat his offenses is not a "fact" subject to rebuttal testimony. *United States v. Partyka,* 30 MJ 242 (CMA 1990). The Court of Military Review agreed that the rebuttal testimony was improper but held that the error was waived by failure to make a timely objection. Mil.R.Evid. 103(a)(1). Unpub. op. at 2. We agree that the error was waived and that it does not rise to the level of plain error. Mil.R.Evid. 103(d).

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and CRAWFORD concur.

## APPENDIX

6. RECOMMENDATIONS: After considering all prior recommendations, the available facts and circumstances, the seriousness of the offenses charged, and the maximum punishment authorized to be imposed by special and general courts-martial, I recommend the Charges and Specifications be referred to trial by general court-martial as a noncapital case.

GREGORY G. PARROTT
Attorney-Advisor
Assistant Director, Military Justice

I have read the Charge Sheet, the Article 32 Report of Investigation, the allied papers, and the foregoing Advice. I agree with the Advice and the opinions and recommendations made therein.

*Howard P. Sweeney*

HOWARD P. SWEENEY, Colonel, USAF
Staff Judge Advocate  2 Apr 90

Approved. I order the following Charges referred to trial by general court-martial as a noncapital case.

CHARGE I:  Violation of the UCMJ, Article 120

Specification 1:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in October 1989, rape _____.

Specification 2:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in November 1989, rape _____.

Specification 3:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in December 1989, rape _____.

CHARGE II:  Violation of the UCMJ, Article 134

Specification 1:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in October 1989, commit an indecent act upon the body of _____ , a female under 16 years of age, not the wife of the said STAFF SERGEANT WILLIAM N. STINSON, by fondling her breasts and vagina with his hand, with intent to gratify the lust, passion, and sexual desires of the said STAFF SERGEANT WILLIAM N. STINSON.

Specification 2:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in November 1989, commit an indecent act upon the body of _____ , a female under 16 years of age, not the wife of the said STAFF SERGEANT WILLIAM N. STINSON, by fondling her breasts and vagina with his hand, with intent to gratify the lust, passion, and sexual desires of the said STAFF SERGEANT WILLIAM N. STINSON.

Specification 3:  In that STAFF SERGEANT WILLIAM N. STINSON, United States Air Force, 602d Tactical Air Control Wing, did, at or near Spanaway, Washington, sometime in December 1989, commit an indecent act upon the body of _____ a female under 16 years of age, not the wife of the said STAFF SERGEANT WILLIAM N. STINSON, by fondling her breasts and vagina with his hand, with intent to gratify the lust, passion, and sexual desires of the said STAFF SERGEANT WILLIAM N. STINSON.

*Richard J. Trzaskoma*

RICHARD J. TRZASKOMA
Major General, USAF
Commander

WISS, Judge (concurring in part and concurring in the result):

I agree with the majority that the court-martial that tried appellant had jurisdiction to do so because the convening authority's decision to refer the case as noncapital is manifest. I agree, as well, that appellant's failure to object to what I otherwise would hold was improper rebuttal testimony waived his appellate complaint. Mil. R.Evid. 103(a)(1), Manual for Courts–Martial, United States, 1984. Finally, I agree with the majority that Ms. McIntyre properly qualified as an expert witness and that her omission to base her testimony on any knowledge of appellant himself (because she had not interviewed him or investigated his particular background) did not, *per se*, cause her testimony to be inadmissible.

This lack of any insight into appellant personally, however, as well as a broader concern, cause me to disagree with that paragraph in the majority opinion that affirms the military judge's overruling of appellant's objection to the scope of McIntyre's testimony. 34 MJ at 239, First, the record contains no basis for concluding that the witness had the necessary expertise for offering a "prognosis" of *anyone*'s "high risk of reoffense." Second, even if she did have sufficient expertise to offer such speculative testimony, her ignorance of any knowledge of appellant as a person gave her an inadequate basis here for her opinions—or, at a minimum, reduced the relevance of her opinions to such a minimal level that the risk of unfair prejudice substantially outweighed its probative value, *see* Mil.R.Evid. 403.

### I

McIntyre's formal education, as far as we know, extended only to a *bachelor's* degree in psychology and sociology and a master's degree in *social work*. Her practical education, through experience as a social worker, involved working with victims and perpetrators of child sexual abuse. Unfortunately, I see nothing at all in the record of trial that offers an adequate basis to conclude that, in light of her formal education or her experience or both, McIntyre's expertise extends to the complex intricacies of mental health—*especially* that area of mental health that involves predicting future behavior.

Mil.R.Evid. 702 is not a gate of admissibility without any sentries. Only one who qualifies as an expert—by virtue of having "scientific, technical, or other specialized knowledge"—may pass through; even then, such person may pass through *only* for purposes of testifying *within that expertise. See United States v. Hill–Dunning*, 26 MJ 260 (CMA), *cert. denied*, 488 U.S. 967, 109 S.Ct. 494, 102 L.Ed.2d 531 (1988). Thus, the rule permits a qualified expert with such specialized knowledge to "testify *thereto*." (Emphasis added.)

In the absence of any demonstration that McIntyre *herself* possessed any "scientific, technical, or other specialized knowledge" about mental health that was sufficient to permit her to predict future behavior, the majority opinion today implies that *any* mere social worker operating in the area of child sexual abuse is an "expert" in mental-health predictions. I must disagree. Such predictions are risky enough even when offered by psychiatrists or psychologists; certainly, they are not ordinarily within the ken of a social worker.

### II

Aggravating this situation is the fact that, though McIntyre purported to opine as to *appellant's personal* "prognosis" for "reoffense," she did so without any knowledge of *appellant himself.* Instead, she quite clearly did so on the basis of her social work *generally* with victims and perpetrators of child sexual abuse. Unless McIntyre was prepared to testify that *all* child sex abusers have "a fairly poor prognosis" and that *all* child sex abusers reflect "[a] high risk of reoffense," the witness lacked an adequate foundation upon which to offer an opinion as to *appellant's* propensities in these areas.

Moreover, I do *not* believe that her testimony *can* fairly be read to so condemn *all* child sex abusers. That is a far cry from

testifying, as she did, that all such abusers must be ever vigilant against future opportunities for abuse. Just as all recovering alcoholics are not inevitably tainted as poor prospects simply because all alcoholics must be constantly conscious of their weakness, there is no evidence in *this* record, at least, that all child sex abusers are so tainted simply because all such abusers must be forever on guard against their weakness.

Moreover, if somehow one might rationalize that, notwithstanding this objection, McIntyre's testimony manages to slip through the gate of admissibility, surely the fact that she branded appellant *personally* with such a dim hope for the future—without knowing anything about appellant *personally* except for his crime—reduces the probative value of her testimony to such a low level that the danger of unfair prejudice from such a damaging prognosis substantially outweighs that probative value. *See* Mil.R.Evid. 403.

### III

Nonetheless, I am satisfied that appellant was not prejudiced by the challenged testimony. I am assuaged by the fact that this was a bench trial. Rules of evidence do not become inoperable just because a judge tries the case rather than members. *See* Mil.R.Evid. 1101(c); RCM 1001(c)(3) and (d), Manual, *supra*. Even so, unless the record shows to the contrary, a military judge is presumed to know and follow the law. *United States v. Lewis*, 12 MJ 205, 208 n. 4 (CMA 1982).

As the majority opinion sets out, the military judge himself questioned McIntyre in some detail, and I am persuaded from the full context of that examination that the military judge did not treat McIntyre's opinion as a *personal* prognosis of appellant's *individual* chances for recovery (though *she* quite clearly *expressed* it in personal terms); rather, the military judge received the opinion as a more generalized view of prognoses for this type of offender. Even in that context, the exchange implies that the military judge was not overly enamored of the opinion.

For these reasons, I concur in the majority's affirmance of the sentence, although I am fully persuaded of the substantive merit of appellant's challenge to McIntyre's prognosis testimony.